IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ARTERO HOLLINGSWORTH, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 11 CV 4597 |
| v. ) | |
| ) | Hon. Charles R. Norgle |
| CITY OF AURORA, et al., ) | |
| ) | |
| Defendants. ) | |

**OPINION AND ORDER**

Plaintiff Artero Hollingswoth ("Plaintiff") sues Defendants Aurora Police Officers Maxwell Worcester ("Officer Worcester") and Che Earwood ("Officer Earwood") (collectively, the "Officers") and the City of Aurora (collectively, "Defendants") for excessive force pursuant to 42 U.S.C. § 1983. Before the Court is Defendants' motion for summary judgment. For the following reasons, the motion is granted.

**I. BACKGROUND**

The Court takes the undisputed facts from the parties' Local Rule 56.1 statements, including the video evidence of the incident. See Defs.' L.R. 56.1(a)(3) Statement of Undisputed Facts In Support of Mot. for Summ. J. Exs. 1 & 2. To the extent that Plaintiff's version of the facts differs from what can be seen in the uncontested video, the Court views "the facts in the light depicted by the videotape." Scott v. Harris, 550 U.S. 372, 380-381 (2007) ("Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such a visible fiction; it should have viewed the facts in the light depicted by the videotape.").

On February 5, 2011, Aurora Police Officers Worcester and Earwood were on duty. During their in-service meeting prior to their shifts, the Officers became aware of an investigation into a robbery that had occurred earlier that morning. During the robbery, a substantial amount of money had been stolen. The victim identified his son as the driver during the robbery. Officers Earwood and Worcester were given a description of the suspect driver, his name, a description of the vehicle, and the license plate information, so that they could keep a look out for the suspect while on their patrols.

Later that day, Officer Worcester was driving down Galena Boulevard when he spotted a black Nissan Altima, which matched the vehicle description and license plate number of the vehicle involved in the robbery. The vehicle was being driven by the suspect, Jose "Joey" Velasquez ("Velasquez"). Velasquez's girlfriend, Nicole Deuchler, was in the front passenger seat and Plaintiff was sitting in the rear passenger-side seat. Plaintiff had accepted a ride from Velasquez in order to pick up food and cigarettes. At the time, Plaintiff did not know that Velasquez or his vehicle had been involved in a robbery earlier that day.

Next, Officer Worcester made a U-turn and activated his emergency lights. Officer Worcester noticed the two other passengers in the vehicle, but did not have any information about them. He then pulled toward the vehicle and exited his marked squad car while wearing his police uniform. Officer Worcester approached the driver's side of the black Nissan, and instructed the driver to place the vehicle in park and remain inside the car. The driver did not comply; instead, he drove away from Officer Worcester, turning right into Galena Boulevard heading east. The interaction was captured on video by Officer Worcester's squad car camera.

Officer Worcester used his radio to inform the police dispatch of the situation, stating that the suspects went east on Galena Boulevard. He then returned to his squad car, activated his

siren, and attempted to follow the suspects. Officer Earwood heard Officer Worcester's radio transmission regarding the incident, as well as the previous transmissions about the robbery. Officer Earwood was located approximately one block away from Officer Worcester working on an unrelated case, and he immediately started to drive toward the location of the suspect vehicle in his marked squad car.

Officer Earwood's squad car also contained a camera which captured the following events on video. Officer Earwood activated his lights and allowed the suspects to drive past him going east on Galena Boulevard. He then made a U-turn and began following the vehicle in which Plaintiff was riding. Officer Worcester followed behind Officer Earwood in such a way that he could see both Officer Earwood's squad car and the suspect vehicle. Officer Earwood testified that he and the suspects were driving between forty and forty-five miles per hour. Plaintiff, however, testified that the vehicle that he was riding in was only going twenty miles per hour.

Approximately sixteen seconds after Officer Earwood began following the suspect vehicle, the rear passenger door opened. A second later, the front passenger door also opened, and the car continued moving down the street. Twelve seconds after the rear passenger side door opened, a man, later identified as Plaintiff, stuck his feet out of the moving vehicle. In the squad car video, Plaintiff's feet can be seen dangling from the car and dragging on the pavement. Fourteen seconds later, Plaintiff extricated himself from the rear passenger door of the moving vehicle, which had slowed, but not stopped. Once Plaintiff exited the vehicle, Velasquez drove away and turned right at the upcoming intersection.

When Plaintiff got out of the car, he faced away from Officer Earwood, stumbled, and pulled at the back of his pants. Plaintiff then turned around toward Officer Earwood and began

to put his hands out when Officer Earwood leapt at Plaintiff and pulled him to the ground. Only three seconds had elapsed from the time that Plaintiff exited the moving vehicle and Officer Earwood took him to the ground. Officer Worcester joined Officer Earwood four seconds later and helped him secure Plaintiff. Neither of the Officers had his gun drawn. It took the Officers over a minute to handcuff Plaintiff, who can be seen kicking and struggling in the squad car video. After the Officers handcuffed Plaintiff, Officer Worcester moved Plaintiff's legs with his hands and his feet to help Plaintiff roll over and get into a sitting position. The Officers called an ambulance upon discovering that Plaintiff was injured.

Plaintiff initiated this lawsuit on July 7, 2011. On November 22, 2013, he filed his Second Amended Complaint, alleging one count of excessive force against the Officers pursuant to § 1983, and one count seeking indemnity against the City of Aurora pursuant to 745 Ill. Comp. Stat. 10/9-102. Defendants' motion for summary judgment is fully briefed and before the Court.

## II. DISCUSSION

### A. Standard of Decision

"Summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Matz v. Klotka, 769 F.3d 517, 522 (7th Cir. 2014) (quoting Fed. R. Civ. P. 56(a)); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Wells v. Coker, 707 F.3d 756, 760 (7th Cir. 2013) (internal quotation marks and citation omitted). The Court views the evidence and draws all reasonable inferences in the light most favorable to the nonmoving party. Id. But before the nonmoving party "can benefit from a favorable view of evidence, [he] must first actually place evidence before the courts." Montgomery v. Am. Airlines, Inc., 626 F.3d

4

382, 389 (7th Cir. 2010). Simply showing that there is "some metaphysical doubt as to the material facts" will not defeat a motion for summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (citations omitted); see also Argyropoulos v. City of Alton, 539 F.3d 724, 732 (7th Cir. 2008). "Summary judgment is appropriate if the nonmoving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Majors v. Gen. Elec. Co., 714 F.3d 527, 532 (7th Cir. 2013) (quoting Celotex Corp., 477 U.S. at 322). "[G]ranting summary judgment for the defendant is appropriate when a video discredits the plaintiff's version of events." Rivera v. Jimenez, 556 F. App'x 505, 507 (7th Cir. 2014) (citing Scott, 550 U.S. at 378-81; Poole v. City of Shreveport, 691 F.3d 624, 630-31 (5th Cir. 2012); Thomas v. Durastanti, 607 F.3d 655, 664-65 (10th Cir. 2010); Wallingford v. Olson, 592 F.3d 888, 892-93 (8th Cir. 2010)).

**B. Excessive Force Claim**

Plaintiff alleges that Defendants used excessive force against him in violation of his Fourth Amendment rights when Officer Earwood tackled him to the ground. Although not alleged in the Second Amended Complaint, Plaintiff also claims, for the first time, that Officer Worcester used excessive force when he "kicked and shoved [Plaintiff's] injured leg while [Plaintiff] was lying prone on the ground." Pl.'s L.R. 56.1(a)(3) Statement of Additional Facts ¶ 25. Defendants argue that the force used was reasonable under the Fourth Amendment, or, in the alternative, that they are entitled to qualified immunity because "their conduct did not violate any Fourth Amendment rule that was clearly established at the time of the events in question." Plumhoff v. Rickard, 134 S. Ct. 2012, 2020 (2014).

> "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established

5

statutory or constitutional rights of which a reasonable person would have known. Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."

Mordi v. Zeigler, 770 F.3d 1161, 1163 (7th Cir. 2014) (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009)). "Once a public official has raised a defense of qualified immunity, the plaintiff must establish two things in order to defeat the defense: first, that the facts alleged describe a violation of a protected right; and second, that this right was clearly established at the time of the defendant's alleged misconduct." Id. at 1163-64 (citations omitted).

Defendants argue that the undisputed facts, as depicted in the videotape evidence, do not describe a violation of a constitutional right. "A claim that law-enforcement officers used excessive force to effect a seizure is governed by the Fourth Amendment's 'reasonableness' standard." Plumhoff, 134 S. Ct. at 2020. "[D]etermining the objective reasonableness of a particular seizure under the Fourth Amendment 'requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" Id. (quoting Graham v. Connor, 490 U.S. 386, 396 (1989)). "The inquiry requires analyzing the totality of the circumstances." Id.

In assessing whether an officer's use of force is "objectively reasonable in light of the information known at the time of an arrest," the Court looks at three factors: (1) "the 'severity of the crime at issue,'" (2) "'whether the suspect poses an immediate threat to the safety of the officers or others,'" and (3) "'whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight.'" Miller v. Gonzalez, 761 F.3d 822, 828-29 (7th Cir. 2014) (quoting Graham, 490 U.S. at 396).

6

As to the first factor, the initial crime at issue was a robbery involving a substantial amount of money. Although there is no indication that a weapon was used in the earlier robbery, that fact alone does not deprecate the seriousness of crime. See Baird v. Renbarger, 576 F.3d 340, 344 (7th Cir. 2009) (stating that "crimes that contain the use of force as an element," such as robbery, are serious crimes for purposes of the Graham factors). In addition, it is irrelevant whether Plaintiff matched the description of the robbery suspect, or whether he participated in the robbery at all. Plaintiff was riding in a car which matched the license plate number and description of the suspect vehicle, which was being driven by a man who matched the description of the suspect robber.

Next, as far as the Officers knew at the time, Plaintiff posed an immediate risk to them and the general public. At the time of the arrest, the Officers knew that Plaintiff was a passenger in a fleeing vehicle that had been involved in a robbery earlier that morning. Although Plaintiff testified that the car was traveling at only twenty miles per hour, it was still evading two marked police cars with flashing lights and sirens, while moving through a busy commercial area of town with traffic moving on both sides of the street and intersections. Additionally, the Officers had no way of knowing whether Plaintiff, an unknown man, was armed when he opened the door of the moving vehicle and stuck out his feet—at times allowing them to drag on the street, or when Plaintiff ultimately climbed out of the moving vehicle. Indeed, the Officers could have reasonably believed that a man desperate enough to jump out of a moving vehicle posed a risk to the public.

With respect to the third factor, Plaintiff was evading arrest by flight. Plaintiff rode in a car that was fleeing from the Officers. Plaintiff then jumped out of the moving vehicle, and was tackled by Officer Earwood seconds later. Plaintiff argues that he was innocent, that he did not

7

intend to flee, and that he continuously asked Velasquez, the driver, to pull over so that he could get out of the vehicle because he did not want to be involved. Plaintiff's state of mind and intentions, however, were not known to the Officers, and thus are irrelevant for purposes of this analysis. As far as the Officer's knew, Plaintiff may have been an accomplice or armed, or he may have jumped out of the vehicle to continue his flight by foot in the hope that the Officers would follow the car, and not him.

Plaintiff also argues that he was not resisting or evading arrest because as soon as he left the vehicle, he put his hands up in surrender. Plaintiff further contends that he never heard Officer Earwood tell him to show him his hands and get on the ground. Even assuming that Officer Earwood said nothing, Plaintiff's claim that he fully surrendered before being tackled is belied by the squad car video. Only three seconds passed from the time that Plaintiff climbed out of the car to the time that Officer Earwood took him to the ground. In those three seconds, Plaintiff is seen facing away from Officer Earwood, stumbling at the curb, and grabbing at the back of his pants before he finally turns toward Officer Earwood and begins to raise his hands. Officer Earwood had three seconds to determine whether and how to prevent Plaintiff, an unknown risk, from further flight or harm.

Furthermore, Officer Earwood was not required to rely on Plaintiff's "last-second surrender." Johnson v. Scott, 576 F.3d 658, 659 (7th Cir. 2009). "When a suspect waves the white flag of surrender, the use of force in connection with an arrest may, as an objective matter, become unnecessary and inappropriate. Not all surrenders, however, are genuine, and the police are entitled to err on the side of caution when faced with an uncertain or threatening situation." Id.

In Johnson, the plaintiff, a suspect in a shooting, initially fled the police by car, and then he exited his car and began to flee on foot. The defendant-officer and his police dog pursued the plaintiff on foot through yards and over fences, until the plaintiff encountered a five-foot tall wooden fence. At that point, the plaintiff "turned around, put his arms in the air, and said 'I give up.'" Id. The defendant-officer and his canine were only six to eight feet behind the plaintiff when he gave up. Nevertheless, the police dog grabbed the plaintiff's arm, and the officer knocked the plaintiff to the ground and struck him several times to subdue him because he appeared to be resisting arrest while struggling with the dog. The plaintiff argued that the defendant-officer and his canine used an unreasonable amount of force to subdue him after he had surrendered a mere second beforehand. The court found that the officer was not required to rely on the plaintiff's last-minute surrender and that the force used was "objectively reasonable, given the uncertainties in the situation that faced him." Id. at 661.

"The critical fact in Johnson was that the officer 'had no idea how Johnson was going to behave once he was cornered,'" and "while officers may not continue to use force against a subdued suspect, Johnson was not yet known to be subdued when his pursuers applied force." Miller, 761 F.3d at 829-30 (quoting Johnson, 576 F.3d at 660).

As in Johnson, Officer Earwood's use of force in subduing Plaintiff by taking him to the ground was reasonable under the totality of the circumstances. The Officers had no way of knowing what Plaintiff was going to do when he jumped out the car—an uncertainty that could not have been overcome in the brief moment when Plaintiff decided to face the Officers and raise his hands. Officer Earwood's use of force was objectively reasonable.

Plaintiff also argues, for the first time, that Officer Worcester used excessive force against him in violation of his Fourth Amendment rights when Officer Worcester adjusted his

9

legs while attempting to move Plaintiff into a sitting position. The Court rejects this claim. The video shows nothing more than Officer Worcester nudging Plaintiff's legs so that he can sit up and no longer lay face-down on the snowy sidewalk. The use of the force, if any, was reasonable. Because the force used against Plaintiff was objectively reasonable, Defendants are entitled to summary judgment on Plaintiff's Fourth Amendment claim.

In any event, the Officers would be entitled to qualified immunity because Plaintiff failed to show that the right was clearly established at the time of alleged misconduct "either by 'identifying a closely analogous case or by persuading the court that the [officer's] conduct [w]as so egregious and unreasonable that, notwithstanding the lack of analogous decision, no reasonable officer could have thought he was acting lawfully.'" Gibbs v. Lomas, 755 F.3d 529, 540 (7th Cir. 2014) (citing Abbott v. Sangamon Cnty., 705 F.3d 706, 723-24 (7th Cir. 2013)). Defendants were entitled to rely on Johnson, the controlling law in this Circuit, by using reasonable force to subdue Plaintiff despite his last-second surrender. Therefore, summary judgment in favor of Defendants is appropriate.

### III. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted. Because Defendant is entitled to summary judgment on Count I, Plaintiff's indemnity claim in Count II is dismissed as moot. This case is terminated.

IT IS SO ORDERED.

ENTER:

_____
CHARLES RONALD NORGLE, Judge
United States District Court

DATE: December 11, 2014